Local 241 We're a little bit early. Is the other side here? Yes. Okay, tell us who you are, who you represent, and how much time you need. Steven Tuplinski for the Chicago Transit Authority, and I should not be any longer than 10 minutes. Okay. You will take note that we have read the cases, we've read your briefs. I would suggest that you stick to your strong points. If we have any suggestions, the justices are not shy in asking them. I gather that from the first argument. Take your time. Let's get settled first. Okay. Proceed. May it please the Court, Steven Tuplinski on behalf of the CTA. I want to make it clear that the CTA's appeal in this case is not about saying that arbitrator Cox got the facts wrong in this case. We believe that this appeal goes really to the responsibility of the Illinois courts to be protectors of the public's interests and to determine what does and what does not violate public policy in this state. We challenge, the CTA challenges the arbitrator's decision because we believe it is fundamentally contrary to established public policy in this state. We believe it is inherently irrational, and we believe that allowing arbitrator Cox's decision and the affirmation by the circuit court, of course, allowing that to stand would denigrate well-established principles, that it's the Illinois courts and not arbitrators that have responsibility for protecting the public interest. I know that your honors have read the briefs, and therefore, I know that you are familiar with the facts that led to Mr. Gibson's conviction for deviance. Just to make sure I understand it, we're not reviewing the CTA's action. We're not saying whether or not they were right. We're reviewing whether the arbitrator. Correct. Right. Our position is that, you know, the CTA discharged Mr. Gibson. The case went to arbitration pursuant to the collective bargaining agreement. Arbitrator Cox for the case, and this is an appeal of his award, essentially, well, of the affirmance of his award, whereby he reinstated Mr. Gibson to his position as a CTA bus driver. Let me ask a few questions. Was there a specific rule that required Mr. Gibson to report his conviction? No. There are, the CTA, the specific rules involved were CTA has a rule, number one, against being convicted of a felony. It has rules against, I don't have it at my fingertip, you know, acting not in the best interests of the CTA. But specifically, no, there was not a rule that he disclosed his conviction. But as I, as we argue and as we will argue, I think that was a very important factor in the public policy violation. So there was no rule that would require automatic termination then? Well, there is a, the CTA does have a rule that says conviction of a felony can be cause for termination. The testimony in the case was that because of the nature of his responsibilities as a bus driver, because of the safety aspects, because his route included driving past schools, that given all those facts together, that the CTA felt that this indeed was a circumstance that warranted termination for the violation, for the rule violation of having a felony conviction. So it's not automatic that you get, that you are terminated if you have a felony conviction. You know, it depends on the factors. In this case, the CTA stated what those factors were and they were all based on safety concerns as well as the fact, as was testified by the manager, that when this finally was brought to the attention of the CTA, one of the things that Mr. Gibson presented was a letter, a letter of report from Dr. Falco in 2001, which among other things said that Mr. Gibson still hadn't passed the required polygraph test with regard to whether or not he was telling the truth in terms of whether he had engaged in what was referred to as problematic behavior. So that was a piece of paper that Mr. Gibson presented to the CTA at the time, you know, that they learned of this conviction. Well, I can certainly appreciate the concerns of the CTA, no question about that. What I'm laboring with is, with all the jobs the CTA has, and if this individual if there was some concern, then how come they just couldn't reassign him to another position? Well, I mean, I guess that's a valid question. He did not, you know, honestly, Mr. Gibson did not request assignment to another position, nor did the CTA think that it was appropriate under the circumstances. Well, he couldn't very well request. He was terminated. Well, no, he actually, with all due respect, he could request it as part of the grievance process. Going back to the idea of felons may be able to, felony conviction may be grounds for dismissal, the record reflects that somebody from the CTA testified they were unfamiliar, they'd never heard of anybody who had a felony conviction being retained by the CTA, is that right? That's what the record reflects. I mean, that was certainly the, it's accurate. You're not making that up. A witness said that. No, that's what he said. Nor am I aware of that, but that is what the witness testified to. You know, whether statistically or not, that's correct. The testimony was that they went over the factors. Right. How do we write this then, though, counselors? We have this all the time. Public policy, I'd say that 90% of the appeals we hear in this field were the municipalities, the governments, not just municipalities, sign collective bargaining agreements. They agree that they will abide by arbitrations. They choose to do this. Then the arbitrator goes against them, and then they're unhappy with that, and they come running in here saying, gosh, boy, that arbitrator's against public policy. Every, 90% of the cases, that's their argument. Whether it be stolen underwear, in this case, child molestation. When you know, and the lie is, recently from our Supreme Court, I have guys who smoke dope while driving coal trucks, they get reinstated because the burden is so high. How are we to write this? Well, my answer to that question is, each case is still fact specific. And regardless of whether or not, you know, other public bodies, you know, choose to appeal on that basis, I feel very, very strongly, and the CTA feels very, very strongly, that this is one of those cases where it needs to be righted. I think, you know, I guess I can just get to the heart of what my position is on the public policy here, is if arbitrator Cox's ruling is allowed to be upheld, what we're saying is, because Mr. Gibson, the convicted sex offender, was able, and I'm not saying I agree, he didn't have a responsibility to report this, but because he was able to hide this from the CTA, because he was never informed the CTA of his probation conditions, which among other things required that he not be alone, unsupervised with children, because he did not complete his treatment, none of this happened until a member of the public anonymously sent to the CTA his sex offender registry. So under arbitrator Cox's award is irrational to me, because what it says is, you were able to get away with it, and hide it, so therefore, so therefore, you win, and we're rewarding you, we're rewarding, it doesn't make any sense, because if the CTA But he said, you've been reformed. Well, I I mean, CTA is 100 percent right. I disagree that he said that, though, Your Honor, because I know I'm wrong. Because it's, it's, it's inconsistent. To me, it's, this is what I refer to in the brief as, as, and I'm sorry if I'm getting passionate about this, but counsel and I have both been in this case from the very beginning. This is, this is what I call a splitting the baby decision, and arbitrators, sure, they do that all the time, but you can't split the baby in a public policy case. You can't say, okay, you know, we won't give you back pay for two and a half years, because you, after you were finally caught, and after you took an appeal, and after we were in arbitration, that, you know, then you went, and you, and you got a, someone to evaluate you, and said you're okay, and even though I think you're okay, I'm still going to require you, concurrently, to finish a sex offender program. To me, it's inconsistent. The award is irrational in that regard. It's inconsistent, and this is not the kind of case that can be compromised on those grounds, and I think that's what Arbitrator Cox is doing here, and I think that's a terrible message. How do you, how do you explain the fact that he said, we're not going to give you back pay? Does that follow into this argument? Yeah, I think that that's totally inconsistent. If the CTA had a right to fire him, then they had a right to fire him. If the CTA didn't have a right to fire him, then why didn't he get back pay for all those years? Because he wanted to get around Judge Campbell's fire worker, fire fighter's case, that's why. The firefighter's case was reversed by, actually, this division, not any members of this group, for not having any discipline for these people that were doing terrible things on videotape. So I'd suggest to you that would, that would send a shockwave through the arbitration world and through America, because it was played every night for about four years, that, so when the arbitrators would send them all back with no punishment, that was a basis this Court used to say, we're sending it back. So I'd suggest to you that they're well aware of it, that arbitrators are probably more aware of the law in this area than judges are, and so they would see that and say, well, I'm more likely to be affirmed, and nothing, I don't think there's anything wrong with this, they're supposed to want to be affirmed, if I impose a two-year suspension without pay. That's why he did that, I'd suggest. I don't know, but that's rational, the only rational reason why he would do that. The arbitrator, of course, heard her testimony, and there were a couple of psychologists, and one from the CPA, and correct me if I'm wrong, I believe that the psychologist, that they agreed that this individual working as a bus operator had not and would not increase Gibson's risk of reoffending. It sounds as if your psychologist was saying that this guy, since he's a bus driver, we think he'll be OK, and nothing will happen, and he's no harm or risk to the public. Am I reading that wrong? I think that that's an oversimplification. I think he had concerns which are, they're brought out in the factual basis. But I will say, with regard to the psychologists, I believe that there was no need for the arbitrator to ever get there. I think that the starting point was whether the CTA had caused the fire to this guy, and I think everything pointed to the fact that they did, and the arbitrator relied on these psychologists, one of whom, and this is one of the points I was trying to make in terms of not 2006, Mr. Gibson didn't even have this additional evaluation that showed he was not a harm anymore, let's say, until after this grievance and arbitration process started. I mean, this case should be judged on the facts that existed at the time that they were involved. I don't think that the CTA is entitled to the benefit of this delay. The CTA fired him based on what they knew at the time, including the piece of paper that he gave them that said he had failed to pass his required polygraphs. I thought it was sort of my question before. Can the arbitrator say the CTA was right, but now he's OK to return to work? Can the arbitrator say that? I think that that would violate public policy. Ignoring the fact that it violates public policy, can the arbitrator say the CTA was justifying and firing him, but he's been rehabilitated? Say he had a narcotic or alcohol problem. He was fired because he was abusing alcohol, but now he went through a couple of programs, he's a model citizen, and he's preaching anti-narcotics. So rehire him now. Can the arbitrator do that? I think under the appropriate facts, the arbitrator can do that. I don't think these are the appropriate facts. OK. So as you said before, it's fact driven. I think it's very fact specific. OK. How does the current ruling affect the CTA's current policy, their hiring, retaining policy? How does it affect it? Just in three or four sentences. How does the current ruling of the arbitrator, and perhaps our opinion, affect the CTA's hiring practice, his retaining practice? How does it affect the CTA? Just briefly. Well, I think Arbitrator Cox, in his opinion, which is yet another highlight of the original rationality, said something to the effect that the CTA has every reason to fear substantial liability by hiring, by bringing back someone who is a sex offender. That's certainly one thing. I mean, you know, I'm not saying that Mr. Gibson would offend again and I don't have a crystal ball and no one else does, but God forbid it should ever happen, you know, that would be a tremendous effect. And also, you asked me as a practical matter, and this is not in the briefs, this is just, if you read the, you know, you just have to read the newspapers and watch the television and see, you know, that there are current labor strikes going on, I think it would send a terrible message if this Court reinstated a convicted sex offender who failed his polygraphs and … Well, we don't reinstate him. He signed a contract, the CTA decided to sign a contract letting arbitrators who often make things just awful, I mean awful, do whatever they want, and now they've got somebody they don't like from this terrible decision. Well, but the contract doesn't say that you have to keep convicted sex offenders who hide their conviction and fail polygraphs. It says you have to have sufficient cause to fire them. So, you know, Arbitrator Cox, he declared, he declared in his opinion that his ruling doesn't violate public policy. He's the one that said that. So, I don't think that this is a case where we're just disagreeing. And I guess that goes almost to your initial question, or one of your earlier questions, about all the cases that you do see where people raise public policy. This case, Arbitrator Cox said, I didn't violate public policy. So, our position is that it is… Well, Eastern Coal is a leading case, what, four years ago from the U.S. Supreme Court. A truck driver, suppose a bus driver, is smoking dope. He pisses hot, as we say in the business. Several times, the U.S. Supreme Court said that's fine. He's driving, you know, thousands of tons of coal on these gigantic things up and down the mountains in West Virginia, and he's got his job to do. And that's because of standard of review, we're required to Well, I understand. But I would urge this court that it's the Illinois courts, in this instance, that are here to protect the citizens of the state of Illinois. And I think this is a situation that clearly merits that. And I would ask that the circuit court and the arbitrator's award be reversed. Thank you. No questions? Thank you, Counsel. We have some questions. I'd ask you to address them during your argument. Yes. Your Honors, I would like to address a couple of the points you did bring up in the first presentation. This is a case where these two parties had agreed to submit their remedy, to review this case and the facts, and to decide, number one, if termination was appropriate, and number two, if it wasn't, what's the appropriate remedy? The parties in this case specifically give the arbitrator the ability and the authority to fashion the appropriate remedy. In this case, while Arbitrator Cox did touch on public policy, he did so because he had to. That's what the Supreme Court told arbitrators in the Beaux case. It said, when you're dealing with these kinds of issues, these are the things you have to look at, and these are the kind of factual findings and conclusions you need to draw so that we can decide that everything's been taken into consideration. As you've also noted You said that the arbitrator must determine if the termination was appropriate. Correct. We have a Is that basically what he said, though? Well, Your Honor, actually, he said It was appropriate, but I'm not giving you back pay, and he's been reformed. Actually, I think his conclusion was the termination in 2004 was without just cause. That's exactly what his decision says. It was without just cause because But at that time, that is bizarre. You know, there's a legal theory called bizarre. Because at that time, he was not in compliance with his probation. He had not tested recently, negatively. You know, at that time, he was I don't know if he was still on probation, but at that time, he had not complied with anything. Actually It's only afterwards that he complied. Well, what he complied with afterwards was taking a follow-up polygraph. At the time of his termination, he had completed his probation. Oh, no, he agreed to go back to schooling and whatever else, rehabilitation. But he had completed his probation. No, he did not. He had completed his probation. The letter that was The probation itself, not the terms of the probation. And that's I would argue if you read the decision and you read the evidence that that was They didn't say you didn't complete your probation because you didn't take the polygraph. They said this is one thing he would have Well, he didn't do the courses either, in the way I read it. I don't think that's exactly what the conclusion was. No, Your Honor. On page 24 of the blue brief, it says the Gibson worked for the CTA while he committed criminally sexual assault of the child. He failed multiple polygraphs, questioning his continued criminal sexual activities with minors, failed to complete his mandatory treatment program, violated his probation by driving a bus with unaccompanied minors on board. That doesn't that's You do question in your brief the idea that reading, although a term of Gibson's probation included that he not be left unsupervised in the presence of minor children, there is no evidence that he violated such a term while working as a bus operator. Which goes back to one of my favorite nasty questions is, are we required to be morons? In effect, are we required as a court to believe that no minor was on this guy's bus in the four-year period unaccompanied? No, Your Honor, but there are other precautions that have always been in place at the CTA during the time he was driving a bus. One of which, most important, is there's a video camera. So this is, it's not a completely unsupervised setting where bus operators aren't reviewed sometimes on a daily basis to see what's going on on their buses. So that's the statement about that. There's no question that getting, you know, your question regarding you are not required to be morons. We are certainly assured that there was at some point a minor on his bus. The arbitrator's decision in this case rested on the fact that he concluded there was no nexus between the criminal conviction and his job as a bus operator. And that's the key, I think, in this particular case. When you look at the post-Dubose cases, with the exception of one, all of those cases involved misconduct by the grievance that are directly related to their job duties. And that was a key element in this case, is that this is conduct that occurred away from the job. It had nothing to do with his job. Nobody, there was never any complaints about the way he performed his job by any other person. And that was the key to the arbitrator deciding, I can find that their decision to terminate him on the basis of this felony conviction does not meet the standards of just cause. And that's what the arbitrator is supposed to do. But then he went further and he said, I know that I have an obligation to make sure that there are some elements that are met in returning this employee to work. One of which, is there a potential of harm to third people? Has this sanctioned violations of law? And that's where the psychologist came into play. Because this arbitrator wanted to know, if I return this employee to work, which is within my authority and my responsibility, do I have some assurances that I'm not putting the public at risk? And that was the basis for taking the psychologist's testimony, both of them, who testified extensively, and he listened to them extensively. And he made specific, extensive findings of fact regarding the potential of harm, the lack of potential of harm to third people, third parties, and the fact that he had shown an entire record of rehabilitation. But going back to what the arbitrator said, though, as part of his reinstatement, he required Gibson to do one of two things. He had to go back and talk to the Dr. Falco, who he continued to lie through to throughout his treatment period, for a period of three months, or as long as Falco would have him as a patient. They cite, the CTA cites Van Horn versus Mueller, which is a case I had here in the appellate court, and a firm part of my decision about Mr. Madcow-Mueller's priors should be considered when determining a negligent hiring case. In that case, our Supreme Court cited a case called Garaldi versus Community Consolidated School District. A plaintiff sued a school district for negligent hiring based on its employment of a school bus driver who had sexually abused a student. The driver's work history showed only he tended to drive kind of late, and so the appellate court then upheld the idea that their summary judgment was appropriate to throw out the negligent hiring because the school bus company didn't know about his sexual proclivities. Here I suggest the opposite would be true, based on Van Horn and Garaldi. Here the CTA is well aware of Mr. Gibson's proclivities with children. Again, maybe only related children, but maybe just his niece as opposed to his stepdaughter. Maybe only family members, or he has an interest in those. But they're on notice, and I'd suggest under Van Horn, under Garaldi, in a case I wrote which unfortunately I didn't pull, I held that a school bus company could be on the hook for failure to have a school bus monitor on board when they had a child on board who was known to hit other children. And so here the CTA has a school bus driver they know molests children, and they know that because he's confessed. He did it. He pled guilty to it because there's no stronger evidence on earth, I think, than confessing in a court of law, taking your punishment like a man. How could they not be held liable? What's the theory? Should something go wrong? I think that the idea of negligent retention or negligent hiring is not applicable in a situation where parties have agreed to give their dispute to an arbitrator, a contractual dispute, and they've said we will abide by that agreement. And when they're told to reinstate someone, they're not making the affirmative duty to say we're agreeing to retain you. In fact, we obviously know that they don't want to retain Mr. Gibson. Well, they can't sue the arbitrator, unfortunately. And again, I'm not worried. I will not suggest to you that I'm actually worried that Mr. Gibson is going to molest a child on his bus. I'm not. I think the public may be, but I am not worried about that. But I think the public may be. Your Honor, that's an interesting point because there has been no indication that the public is even aware of this situation. If you bring that up, it's interesting. If you look out here and you think this is a big case, it is. It's a hugely important case. There's nobody here other than our law firm and the two lawyers and the three judges and the clerk. But I can assure you when this is written that it will be published. Certainly. Whether it be in Rule 23 or opinion, I don't know. But it will certainly be published. And is that something we should consider? Meaning, no disrespect, is that something we should consider? That, hey, this one got by and he's beefing about it. I know that's not your position. Your position is the CTA has not had any harm up to this date as a result of the public's not knowing about Mr. Gibson's problems. Exactly. Is that something we should consider? I don't think so. Okay. I don't think so. Your Honors, when, you know, the law on the public policy exception is really not at this point. Everybody agrees on what the law says. It's always about the facts of the particular case. But we do have some guidance on the factors that we look at in deciding whether or not a particular arbitration award violates the public policy. And those three factors and both the DuBose court discussed them and actually the AFSCME court, the Supreme Court case right before that also discussed them. And those three factors are the nexus between the misconduct and the harm suffered, whether or not the award in and of itself sanctions violations of law, and whether or not the decision poses harm or threat to third persons. Now, I've already discussed the arbitrator's specific findings of facts, which are binding on the parties as to the ability or that he's been rehabilitated and that there is not this threat to third persons. More importantly is the nexus. There is no, again, it gets back to the underlying decision on the arbitration case, which there is no nexus between what he did and the conduct or his job responsibilities and what he'll be doing as a bus operator. But in agreement, and both sides did a very good job on their briefs, and you did a perfectly wonderful job on the statutes that the state legislature has considered what kind of bus drivers, what kind of bus companies should be able to employ sex offenders, or however you want to phrase it, what kind of jobs can sex offenders have. And they've discussed they're not allowed on school buses, they're not allowed on all sorts of buses, but one of them that they chose not and clearly chose not to bar them from was municipal buses, government buses, however you want to phrase it, common carry. And they've had that in front of them, and they chose not to. I mean, you can't sell ice cream if you're a child molester, and you can't drive a school bus, but you can drive a Greyhound or a CTA bus. Correct. At the same time, since they said you can't drive a school bus or an ice cream truck or things like this, doesn't it cut against it that they're concerned about it? Again, I don't know why they parsed those out, but they did. They absolutely did that. Does that actually help, though, your position that the CTA should reinstate this law? Because it's not barred. It's not against the law for them to retire this. I would argue, Your Honor, that I would agree on both counts. Number one, I think it helps our position because the legislature, you know, they look at these things, they make these decisions, they study everything that's going on, and they decide what are the things we need to do to protect the children in this situation. And they've decided that barring them from employment with the CTA is not one of those things. That doesn't mean they're not concerned with the possibility of harm coming from that. However, they're saying that there's other public policies out there. There's a public policy of allowing sex offenders to be employed. It's a good thing to have people go back to work. The psychologist testified to it. The sex offender laws talk about it. They anticipate people are going to be employed. That's part of the notification requirements. So I think it helps. I understand the concern that you can't say just because it's not in the statute doesn't mean there's not a concern. However, I think that it is more favorable to our position than otherwise. You're talking a lot about legislative enactments as to what they cannot do regarding public policy. But it doesn't say public policy dictates the CTA must have this person drive a bus with schoolchildren on it. It doesn't say that. Cover that. That's correct. So the CTA is saying basically we don't want people that are child molesters or pedophiles, whatever it is, driving a bus. And the arbitrator is saying it's okay for him to drive a bus, which turns into a school bus, I would suggest, between the hours of 3 and 4, perhaps 8 and 9. It basically turns into a school bus. And at times at the end of the run, say in the 90N bus, there's only schoolchildren on it, as it goes from the L station up to wherever it goes. So, you know, isn't that why is that not against public policy? Well, I think it's not against public policy because when you apply the factors that the court has given us, they're all met in this case. The courts. The courts have given, you know, they've said if it's not going to violate public policy, you have to look at these three things, one of which is the threat of harm to third persons. And that's what the arbitrator did. And that was his, within his authority was within his obligation to make those factual findings, which can't be overturned. The CTA argued that they don't, that they're not arguing with the factual findings, but that is exactly what they're doing. They wish this court to make other decisions, to say that the arbitrator was wrong, that there's not a threat of harm under these circumstances with all the facts that we had at these two hearings. It also did not violate or it did not sanction a violation of law, as this individual suffered not only the criminal penalties, but a 27-month suspension is a severe penalty in the world of employment. He lost over $100,000 in pay, medical benefits, and pension contributions. As Judge Quinn said, he's probably a good employee now, especially if they're big scare. I hope he is. Are we telling the CTA now that you must or you allow such people to drive a bus with schoolchildren on it? I don't think we're telling them they have to. I think what the award says is you have to reinstate this bus operator. Once that occurs, there are various steps the CTA can take. They can bargain with 241 about whether they want to move him to a different position. That's happened in the past. One of the questions was about reassignment. That was not something that was offered to this individual. It's something that could happen, but I don't think it's a blanket rule that this means in all cases you have to let X person drive schoolchildren around. But that could, in fact, happen in this case. But based on the factual findings of the arbitrator, I would submit that there's not a threat that that's going to be a problem, because he made specific factual findings on that issue. Ms. Walsh, if you know, going back to a point you made, which I think is an excellent point, it seems to me that the criminal court, when it decided to give Mr. Gibson his probation, had a wide range of penalties available, sentences available, anywhere from probation to up to, usually in these cases, 30 years in prison. And that court considered Mr. Gibson's background, the nature of the crime, and then gave him probation with these various other things, conditions of probation. But then, as you say, he successfully terminated, he was certainly not unsuccessfully terminated, he was terminated. And at the time, does the record reflect, Ms. Walsh, if you know, when the trial court left him on probation, did the trial court know he was a CTA bus driver? Yes, he had to report that fact to them. He had to report his employment. And so the court considered that in sentencing for the criminal act, that he'd rather have a job supporting the victims, if one was a family member and one was like a niece, than not have a job. And for the record, it was actually just one family member. Just a stepmother. Yes, yes. I mean, not that. I know. But it was a one-time issue, one-person conviction, which is what. . . I mean, there's a billion polygraphs about a niece, but again. . . I'm not bringing it to justice. No, the court knew about it. It's pretty clear they knew about it. My colleagues and I are going to labor over this decision. There's no question about it. And there are some things that I want to reiterate that my colleagues said that ring with me. There's a high school about four blocks from my house, maybe six blocks from my house, and every day in front of that high school or at times if I happen to be home or go home early for some reason or just know for a fact, there are probably at least eight or nine buses parked out in front of the high school where the kids come out of the school and get on those buses. And I would imagine at some point there's a last child on that bus. I don't know where the bus goes or, you know, how it functions, but the bus is filled with high school students, seven, eight, nine, every day. So that CTA bus really is a school bus for that period of time. And it just seems to me that although we have to make a decision and that's our job and we'll do it, it just seems to me a lot of this perhaps could have been avoided if the CTA had simply just given this guy another job. He's been working there for 20 plus years. Why not with the tens of thousands of positions the CTA has, why not just give him another position? I can't answer why they didn't do that, Your Honor. I can say that I don't think that the affirming of the circuit court and the arbitrator's decision in this case precludes that as a possibility. I don't think that precludes it as a possibility. Well, we can't say it either, right? I mean, you're familiar more so than we are, I'm sure, with the cases in this field. It comes up all the time on light duty for police and fire. It comes up constantly. And then there's a big issue, well, what kind of jobs would be available? So maybe I would think that Mr. Gibson would be a reliable ticket taker for the CTA, perhaps a maintenance worker, he's probably way up there in years, but certainly a ticket taker. But until we know that, we can't be certain. Exactly. We're not complacent, Your Honor. If I could, addressing that point about the children and being really a school bus, could be a school bus, is the facts of this case, remember, this occurred off-duty. And the psychologist testified extensively about the fact that it was a situational crime that is highly unlikely to be repeated, not, first of all, at all, and second of all, really highly unlikely to be repeated in the course and conduct of his job, given the way the crime occurred and the nature of it. So while I certainly understand the concern anybody would have, we're not talking about taking an employee who was convicted of sexually assaulting children on a bus and saying you must reinstate him to driving that bus. This is not that situation. Thank you. Any other questions? No. Thank you, counsel. I just wanted to address just a few brief points. First of all, Justice Quinn, I am not willing to concede that the record reflects that the trial judge knew of Mr. Gibson's employment. My recollection is that the only thing in the record is that the probation department knew of his employment. It will be contained in a pre-sentence investigation. Well, I haven't done that for 16 years. There's no way in the world a judge would have known Mr. Gibson was an employee. Why would you leave him out of a trial if he didn't have a job? I'm not going to quibble with that. And I just wanted to address finally this no nexus argument that the union raises. I think it's bogus. I think it's red hairy, and this is why. Number one, the Illinois Supreme Court has said in the DuBose case that there is no nexus required in these public policy cases. But even further, if a nexus were required, there certainly is a nexus here. The nexus is his probation required that he not be alone with minor children. And yet by driving a school bus, after his conviction, he's still driving around minor children. Everyone seems to agree that that's a fact.  That's a direct nexus. And if nobody has any further questions, thank you very much for your time. No more questions? Questions? No. Thank you. The court will take the case under advisement. The court will be in recess.